Good morning, your honors. If it may please the court, my name is Alan LeGay. I represent the appellant, Mr. Kempf. This appeal presents three questions. First, whether the trial court had the type of evidence it would need in order to make a finding that Hitachi acted reasonably, relied on the representation, employing the standard of a reasonable man described in Field vs. Man. Second, was the red flag that Hitachi admits having seen, was that red flag sufficient to make whatever reliance it had unreasonable? And did the amended complaint relate back to the date of the filing of the original complaint? In Field vs. Man, the Supreme Court described the difference between justifiable reliance under 523.82a and reasonable reliance under 523.82b as follows. Here, a contrast between justifiable and reasonable reliance is clear. Although a plaintiff's reliance upon the misrepresentation must be justifiable, this does not mean that this conduct must conform to the standard of a reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff and the circumstances of a particular case rather than the application of community standard of conduct applicable to all cases. We submit the trial court submitted reversible error because it failed to evaluate Hitachi's conduct through the application of community standard as required by Field vs. Man. The trial court failed to consider whether Hitachi acted as a reasonably prudent lender under the circumstances. When I counseled Judge Gould, Judge Gould, if you could just elaborate for me in your own words what you think Hitachi did that was so unreasonable in terms of its diligence. It did an evaluation of the transaction. It got guarantees. It didn't catch the point that you stress in your briefs that the trust beneficiary is shown in tax returns to be the wife, not the husband. I realize that, but why would that make Hitachi's conduct undiligent as a matter of law to give a dischargeability remedy to someone who had defrauded them? Your Honor, the question is whether or not the reliance was reasonable. It isn't a question of what due diligence Hitachi performed in the entire transaction, but what due diligence it performed in connection with the reliance that it made. And on the reliance that it made, it's all financial statement that said angel trust. It assumed that the angel trust belonged to Mr. Kemp and that it would have access to all the assets in the angel trust. What did it do in connection with that assumption? It didn't ask a single question and it didn't review a single document. It simply assumed from a joint financial statement that was submitted by the Mr. and Mrs. Kemp that all of the assets on the financial statement belonged to Mr. Kemp. Was that statement prepared for the bank? Was that prepared for Hitachi? Hitachi did not provide a form financial statement, so it was prepared by Mr. Kemp.  At Hitachi's request. So it's prepared specifically for Hitachi in response to their application. Yes. So the fact is that what we have here is blind reliance. So unless this court can say as a matter of law that blind reliance is reasonable reliance, then the judgment must be reversed. And our position is that under field versus man, which is the Supreme Court, and all of the circuits are bound by the Supreme Court, the determination of reasonableness can only be made from the application of a community standard. What would other reasonably prudent lenders have done under these circumstances? So the question is not for me to show that what was unreasonable, but the issue is that Hitachi had an affirmative obligation to present evidence to show that what it did with respect to this representation, not what it did in the balance of the transaction, but what it did to rely on this representation, other reasonably prudent lenders would have done. And why isn't it reasonably prudent for a lender to rely on the representations of the borrower to look at the tax, at least the income tax returns, not the trust return, listed the angel trust and included its income. I understand it was a joint return. It doesn't necessarily tell you who the owner is. And they did a financial transaction analysis. Why isn't that reasonably prudent? Because, Your Honor, the question is not whether they were reasonably prudent in evaluating the business plan of Mr. Kemp, but the question is whether they reasonably relied on the representation that they claimed. And if I may take a second and just read to you what that representation is, because I think this is key because we will see that they didn't do anything with respect to this. Hitachi expressly relied on the representation by Mr. Kemp in his personal financial statement that the assets of the angel trust would be available to support Kemp's obligations under his personal guarantee in making its decision to enter into the master equipment lease with CardioCure. Absent both Kemp's personal guarantee and his representation that the assets of the angel trust were available to satisfy his obligation under the personal guarantee, Hitachi would not have entered into the master equipment lease and would not have accepted the personal guarantee from Mr. Kemp. What did they do with respect to that representation? Nothing. They didn't ask for a copy of the angel trust. What if Mr. Kemp had been a beneficiary of the angel trust, but it had been a spent trust, and therefore Hitachi wouldn't have had access to the assets of the trust? Would Mr. Kemp be guilty of fraud under those circumstances? Hitachi did not ask a single question about the trust, didn't ask a single question about who the beneficiaries of the trust were, did not ask Mr. Kemp what his interest in the trust was, did not even ask to see a copy of the trust. How can that possibly be reasonable? What is the difference between reasonable reliance and justifiable reliance if blind reliance satisfies the standard of reasonable reliance? To me, counsel, if I can pose a question to you, I do get your, I think I see the gist of your argument, but you are putting the reliance on a particular part of the financial statement, like the assets. Then saying, well, they didn't ask questions about this one asset showed on the financial statement. If I question whether justifiable reliance requires inquiry about each asset, you know, on a financial statement. Let's say the statement had shown like ownership of 20 pieces of major equipment, you know, cars, tractors, whatever, and they had like an aggregate value. Does the lender have to get like the title documents on each piece of equipment listed? No, Your Honor. I don't believe that, and I'm not suggesting that they have to do some great degree of relevance. All I'm suggesting here is that Atachi says before this court and that trial that it relied on a very specific representation in the financial statement, and it did nothing in return in connection with that representation. It simply blindly relied. And then we talk about the red flag, which I think is essentially a critical point, because even if we say that the standard of reasonable reliance is low or they don't need to do anything, we all agree that they can't ignore a red flag. What is a red flag? It's something that would alert a reasonably prudent lender to the possible inaccuracy of the representation, and that inaccuracy would become apparent with minimal investigation. Atachi admitted at trial that it saw the informational returns of the Angel Trust and specifically that it saw that those returns said that Julie Kemp was the sole owner and sole beneficiary of the trust. There's no dispute about that. It's in the record. At the time that the Kemps provided their personal financial statement to Atachi, was Peter the only one that was seeking a loan from the bank? Yes. It was never contemplated that Julie Kemp was going to be a party to the transaction, which, of course, raises the second question, would a reasonably prudent lender simply accept a joint financial statement from two people when it only had one borrower, or would it ask, why are you giving me a joint financial statement when there's only one borrower? But going back to the red flag, they say that they would not have made this credit decision unless the assets of the Angel Trust were available to it, and yet the tax returns specifically say, the ones that they saw, they admit that they saw, say no uncertain terms, only Julie Kemp has an interest in the trust, but only Julie Kemp is a beneficiary of the trust, and Julie Kemp is not a party to the trust. I mean, I understand that it only lists as beneficiary Julie Kemp, but I mean, how does one know, unless you have experience with this, that this is not, for instance, one of several beneficiaries or representative beneficiaries, that this exhausts the entire universe of beneficiaries or those who might have access to assets? Because I think the form on its face is asking for the identity of all U.S. beneficiaries. You added the word all there in your answer. I don't see that. I'm looking at the form attached to the tax form. It doesn't say it. It just says name of U.S. beneficiary. If Mr. Kemp were a U.S. beneficiary, then I submit his name had to be submitted. And that's the point. The whole point here is that with minimal investigation, excuse me, Mr. Kemp, what is your interest in this trust, the inaccuracy of the representation would have become immediately apparent. Mr. Link, the Totsie representative, saw this information, and in response to it he did absolutely nothing. He didn't ask a single question. Since I only have three minutes left, Your Honor, I'll reserve. Okay. Thank you. Thank you. Good morning, Your Honors. Frank Kepler, DLA Piper, on behalf of Appellee Hitachi Capital America. The appeal of this matter is virtually frivolous. This was a garden variety 523A2B exception to discharge case. The standard applicable to 523A2B discharge cases is clear. That clear standard is laid out in Candland versus Insurance Company of North America, a 1996 decision that postdates Mr. LeGue's reading, I think erroneous reading, of Field. And more particularly, Girch versus Johnson & Johnson, which is a BAP opinion, admittedly not binding on this court, not even binding on the bankruptcy court, that analyzes just the kind of allegations that Mr. LeGue is raising in defense of a judgment that found his client committed fraud. The reasonableness of reliance is a function of the context in which the reliance is gauged. This transaction was 100% leveraged, new business startup by Mr. Kemp, that was supported by his personal guarantee in addition to the cash flow from operations. The guarantee would be supported by two things, his asset base and his ability to earn in the future. Mr. Link's testimony at trial was clear. But for the personal guarantee and the analysis by Hitachi pursuant to its normal credit application standards, that Mr. Kemp had the assets to respond in judgment to a judgment on his guarantee, they wouldn't have done this deal. It was 100% leveraged. The guarantee was critical. And critical to the guarantee is our assets behind that guarantee, including the trust. Yes. And so Hitachi asked for, in terms of earning capacity, tax returns, which were given to it. Mr. LeGue states that it is beyond question that Mr. Link saw the trust informational returns in the context of Hitachi's deliberation about the credit. I think what the record actually says was that at trial, when showed the financial statements and being walked through the Form 3250s and said, doesn't this, Mr. LeGue cross-examining, or his co-counsel, cross-examining Mr. Link and saying, doesn't this say that Mrs. Kemp is the sole U.S. beneficiary? Mr. Link said, that's what it says. But at the time of the transaction, what they were looking for was asset base. So they asked for a financial statement. And as was key to the bankruptcy court's decision, and this was a finding of fact that should only be reversed in clear error, was that Mr. Kemp made this financial statement up directly in response to Hitachi's question about assets sufficient to support the guarantee. And in that financial statement, Mr. Kemp said, assets of Peter and Julie Kemp, total of asset value $4.2 million, $2.7 of it in this angel trust which was described as an asset. So the bankruptcy court found that this misrepresentation of the assets available to Mr. Kemp overstated the assets available to respond on the guarantee by 63%. And in fact, that's, we've had difficulty collecting as a result of the inability to rely on these assets. But once the plaintiff in a 523A2B action establishes that the debtor prepared the financial statement with an intent to deceive, that is, an intent to induce lending, then the determination of reasonableness on those facts falls to a minimal standard of inquiry. How would you articulate that standard? Well, the court in Girch relied on Bonanzio, which is a Second Circuit case but cited with approval, that says, once it is established that a debtor has furnished a lender with materially false financial statement, the reasonableness requirement is a low hurdle and is intended as an obstacle only for creditors acting in bad faith. I think we did a lot more than that in this case. In this case, we ran the projections. Mr. Link testified at trial. It was cross-examined at length at trial. Mr. Kemp chose to put on no evidence of any kind in support of the defense of his case. He advanced this application for funding through its normal process, including inquiry of public record searches as to Mr. Kemp's creditworthiness and past credit history. It saw nothing to alarm the reports that came back from the public record search did nothing to alert Hitachi that perhaps Mr. Kemp was representing and fraudulently inducing Hitachi's reliance on the credit. And that's really what this case is about. And Lansford, which we cite in our briefs, another Ninth Circuit case, is really at the heart of this appeal, as it was at the heart of the matter at trial. And Lansford says that the court could not credit the debtor's argument that reliance was unreasonable because of the creditor's failure to verify that the information was false. And the court observed that what the debtor in that case, as Mr. LeGue would argue for Mr. Kemp, is asking the court to credit the creditor having intentionally misled the sellers in an area he knew to be important to them. It is unseemly for Lansford, the debtor, now to argue that he should be excused from Section 523 because the sellers believed him. And then it goes on to say that in any event, if there is a duty to investigate, the duty to investigate is minimal. There is no question that could have been a minimal investigation here could well have unveiled the problem. Simply asking questions about the trust or asking for the trust instrument. Isn't that fairly simple? Especially when it constitutes the majority of the personal assets as represented in the financial statement and you do have a tax return that only allows you to raise enough of a question and say, well, can we look at the trust? Is it a spendthrift trust? Are there multiple beneficiaries? What is it? It was held out with the intent to induce reliance as an asset that was available. So there's no duty. You take the position there's no further duty to investigate at that point. Well, there's no duty to investigate if the facts on their face do not prompt a lot more deep crimson red flags. And the 3520 form is not deep enough. No, it isn't. And as the Bankruptcy Court observed and the BAP observed as well, the statements that Mr. LeGue pulls out now were buried, to use the court's word, not my own, on page 18 of a 65-page document. I mean, these tax returns were not prepared for the purpose of education about the trust. They were prepared to show that Mr. Kempf, with his Master's in Business Administration degree and his proven capacity to earn, had done so in the past. Is it reasonably prudent for a lender not to see page 18 of a 65-page document, for it lends millions of dollars? It is reasonably prudent if, had the financial statement, let me turn this around, had the financial statement flagged in any way that the assets of the trust may not be available, yes, it would have a duty of inquiry. But because the financial statement was prepared expressly for the purpose of inducing reliance, then no, it had no duty to comb through the tax returns which were submitted for that purpose. It was prepared for the purpose of proving an ability to earn, to determine that maybe, or as a bankruptcy judge observed, maybe not, you can't tell, the tax returns on page 18, the beneficiary was disclosed, but it didn't necessarily mean that the trust assets wouldn't be available. What about the fact that counsel points out that the financial statement was a joint financial statement, the tax returns were joint financial returns, and yet the personal guarantee was personal to Mr. Kempf? In California, Mr. Kempf, Link testified at trial that it was his understanding at the time that the transaction was being considered, that in California, a community property state, the joint assets of both spouses were responsible for community obligations, and that if Mr. Kempf signed a guarantee, that assets that he was showing could be used to satisfy that guarantee would be available. Now, Mr. Link is not a lawyer, but that was his testimony at trial as to what he. But you would think a lender would know that even in a community property state, you can have separate property. Of course. But if, once again, going back to this financial statement was prepared with the sole purpose of inducing reliance to lend, had it been framed differently and qualified, perhaps it would have increased the duty on Hitachi. Counsel, Judge Gould with a question for you, please. Yes, Judge Gould. Do you view the designation of Julie Kempf, I guess is her name, as beneficiary of the Angel Trust within the tax returns? Do you view that as a red flag or as a almost red flag or as no flag at all? Justice Gould, I consider it to be the faintest shade of pink. I mean, one of the cases analyzes the full range of red in terming red flags. But the fact that Julie was a beneficiary, the fact that the trust was reporting income that went to both of them onto their joint return, it could have supported any one of a number of conclusions. But it certainly was not called out in the financial statement as something that the lender needed to pay attention to. And the cases simply say that once the debtor lies to the lender, the lender doesn't have to hire investigators and go out and find every last piece of information and verify it to be true. Likewise, in the tax return. Tax returns were submitted for Mr. Link testified at trial to show an earning capacity. It did that. They did that. Mr. Link perhaps did not at the time. I don't think that the evidence is, as Mr. Leclerc recites it. At the time of the transaction, I do not believe that there is testimony in the record to support the statement that Mr. Link saw the informational returns and considered them in any way in his analysis. And that's why, to the extent that it's a flag at all, it almost has no color. Because the nature of Mr. Kemp's ability to access information, to access these trust assets, was not called out in any meaningful way in the financial statement, then Hitachi had no duty to try to find the lie through a fine-toothed comb examination of the tax returns, which were submitted for a different purpose. By the way, on that point, is there anything in the record about the underwriting that states that Hitachi is looking to the tax returns to verify income, as opposed to looking at them to check assets? There is testimony in the record from Mr. Link that that is why Hitachi requested the tax returns, and that is the way that they were reviewed in this matter. He was, on cross-examination at trial, asked to look at each of these separate components of the tax returns, and he stated on the stand at that time that, yes, he did see what Mr. LeGloy's colleague was pointing to, and it did say what they said it said. But I don't think that there is any testimony in the record to take it back to 2006 and the date that the financial statement was submitted. Okay. Thank you. I have six seconds, but I won't defer that. Thank you. Thank you, Your Honors. I would say that the scrapbook just conceded that the red flag here was red. I refer you to our appellant's excerpts, volume 2, page 31, lines 9 through 25, to page 31, lines 1 through 9. And I'll just read to you the very first part of it. It says, isn't it true, Mr. Link, that you and your colleagues, and he's referring now to the informational return, at Hitachi relied on the 2004 joint federal income tax return? Yes. Mr. Link, that exhibit that you're in right now, which is the informational return, exhibit E, if you could jog down over to date stamp 838, isn't it true that this is part of the tax return that you reviewed in making this decision? Answer, yes. Isn't it true that line 6A of that document that lists Julie Kemp as the owner, that Peter Kemp is not listed as the owner of the trust? Counsel, that question you just read, Counsel, says isn't this part of the tax return that you reviewed? The yes answer just means that he reviewed the tax return. No, Your Honor, because he's referring, the record refers to a very specific exhibit in the tax return and a very specific date number, and that date number, 838, is the informational return. I thought he asked that afterwards, because I thought he first asked, is this the tax return that you relied on, and the guy said yes, and then he asked, is this entry here, does that show that only Julie was the beneficiary? Your Honor, I would simply refer you to page 31 of our excerpt number 2, and the answer to your question will be crystal clear. He shows them the tax returns that included the informational return. He said, did you review all of these? He said yes. Now, turning your attention specifically to document 838, did you review this document? Is this part of the tax return that you reviewed in making this decision? Yes. So this business about being buried is contrary to the evidence. The evidence is clear that they saw this information, and they didn't ask anything about it. And the argument that says that, you know, once a borrower lies, all bets are off, well, every case under reasonable reliance, the borrower is a lie. That doesn't mean that we don't ascribe a standard to reasonable reliance, and it doesn't mean that that standard has to be established by the application of community evidence. Do you believe that the Manzio case under the Second Circuit that says a very, very low standard of absent bad faith by the creditor is the wrong standard? Your Honor, that court is bound by field versus man as this court is. And field versus man doesn't say that a reasonable man standard is somehow minimized by bad faith or the fact that the lender lied, because we're assuming that the borrower lied, and we're assuming, I guess, that there must be bad faith. The question here is, is what kind of are we going to allow lenders to simply close their eyes, not do anything with respect to the representation they rely on, and then when something goes askew, they can come back and claim fraud? Well, as Lansford points out, it's somewhat unseemly for a lying debtor to turn around, to induce a loan and turn around and say, well, sorry, you didn't see that I lied. Well, then, Your Honor, then the standard should be strict liability. We shouldn't have the question. We're trying to figure out what the standard is. And in In re Candlin, the court says we require little investigation, and then goes on to cite Prosser and Keaton to say that financial status of corporations, et cetera, may justify what you relied on without investigation, even where the falsity of the representation might be discovered with little effort by means easily at hand. It sounds like a pretty low standard that the Ninth Circuit has embraced. Well, and the question, Your Honor, is, is that supported by a reasonably prudent lender standard? There was no evidence that that's how lenders in this circuit operate. And I would also point out that in Candlin, and I'll just read from the opinion, that the application was reviewed by underwriting coordinator Fraser. His review primarily consisted of analysis of financial statement to determine whether certain preestablished requirements relating to liquidity, net worth, and income were met. Fraser customarily compared information with such as an applicant's address and social security number stated on the financial statement with information provided by a credit report. He also looked to the credit report to provide some level of confidence that an application faced no outstanding judgments and was in a position to repay debts. In our case, it was blind reliance. I'm going to assume that we have unrestricted access to the assets of the Angel Trust. I'm not going to ask a single question. Counselor, there is, in that paragraph, I'm looking at the paragraph you just read. I don't see anything in there that sounds like he went, did much more than what Mr. Link did here. Fraser customarily compared information such as applicant's address and social security number as stated on the financial statement with information provided by a credit report. He's comparing their address and their social security number. That's not exactly a searching inquiry. I understand that, Your Honor, but I guess I'm going to make two points. Number one is, what is the representation they relied on here? They say expressly in Mr. Link's declaration submitted at trial, they relied on a very specific representation, not on the financial statement as a whole, not on the net worth of Mr. Camp, but on the representation specifically that they would have access to the Angel Trust. As to that representation, they did nothing. And then with respect to the fact that they saw a red flag that said, in order for them to have access, Mr. Camp has to have either interest in the trust or be a beneficiary of the trust. They admitted at trial that they saw that he was neither, not an owner, not a beneficiary, wasn't listed on a tax return, filed under penalty of perjury. And in response to that, they did nothing. They asked no question. We wouldn't be here today if they had simply said, Mr. Camp, what's your interest in the Angel Trust? Mr. Camp, can we see a copy of the Angel Trust? That's the kind of minimal investigation that these courts ascribe to. There has to be the minimum for what reasonable reliance is. Otherwise, there's no difference between reasonable reliance or justifiable reliance. There's no difference between 523A2B, A2A, and A2B. There has to be a difference. Okay. Thank you. We thank both counsels for the argument. That completes the oral argument calendar for the week. We are adjourned.
judges: Chen, Gould, Bybee